```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,      ) Docket No. 18 CR 743-1
 4                                 )
                       Plaintiff,)
 5                                 )
                  vs.              )
 6                                 )
    BRANDON PITTS,                 ) Chicago, Illinois
 7                                 ) April 29, 2021
                       Defendant.) 3:02 o'clock p.m.
 8

 9           TRANSCRIPT OF PROCEEDINGS - SENTENCING
               BEFORE THE HONORABLE JOHN Z. LEE
10

11  APPEARANCES:

12
    For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
13                            United States Attorney
                              BY:  MR. MATTHEW KUTCHER
14                            219 S. Dearborn St., Suite 500
                              Chicago, Illinois  60604
15

16  For the Defendant:        GIOVANNINI & OLSHANSKY
                              BY:  MR. DENNIS A. GIOVANNINI
17                            216 S. Jefferson St., Suite 101
                              Chicago, Illinois 60661
18

19  Also Present:            MS. JODI HALLERAN, Probation

20
    Court Reporter:          MR. JOSEPH RICKHOFF
21                            Official Court Reporter
                              219 S. Dearborn St., Suite 2128
22                            Chicago, Illinois  60604
                              (312) 435-5562
23            * * * * * * * * * * * * * * * * *

24                   PROCEEDINGS RECORDED BY
                     MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED BY COMPUTER
```

1          (Proceedings had in open court:)

2              THE CLERK:  18 CR 743-1, United States of America vs.

3     Brandon Pitts.

4              THE COURT:  All right.  This is the continuation of

5     our sentencing hearing in this case.

6              Do you want to go ahead and introduce yourselves for

7     the record, please.

8              MR. KUTCHER:  Good afternoon, your Honor, Matthew

9     Kutcher for the United States.

10             MR. GIOVANNINI:  Good afternoon, your Honor, Dennis

11    Giovannini on behalf of Mr. Pitts.

12             THE COURT:  All right.

13             Good afternoon, Mr. Pitts.

14             MS. HALLERAN:  Good afternoon, Judge, Jodi Halleran

15    on behalf of the Probation Office.

16             THE COURT:  Good afternoon.

17             Mr. Pitts, you can take a seat right there at the

18    table.  Thank you.

19             So, at the last sentencing hearing, I asked the

20    parties to address a couple of the arguments as to the offense

21    level and intended loss in a bit more detail.  The parties

22    have submitted their supplemental briefs on the issue, and the

23    government has submitted some additional evidence to support

24    some of its arguments.

25             Is there anything that counsel would like to add with

1    regard to the items that are set forth in their supplemental

2    briefs?

3              Mr. Kutcher, anything?

4              MR. KUTCHER:  No, your Honor, not with respect to the

5    items in the briefs.

6              MR. GIOVANNINI:  No, Judge.

7              THE COURT:  So, first of all, with regard to Mr.

8    Pitts' Criminal History Category, based upon the additional

9    evidence provided by the government, Mr. Giovannini, I

10   understand that Mr. Pitts agrees that his Criminal History

11   Category should be Level III.

12             Is that correct?

13             MR. GIOVANNINI:  Yes, Judge.  That's our

14   understanding based on the evidence that the government

15   presented.  I think it's pretty clear.

16             THE COURT:  All right.  Very good.

17             So, I hereby find that Mr. Pitts' Criminal History

18   Category is Level III.

19             So, turning first to the parties' dispute as to

20   whether or not Section 2X1.1(b)(2) should apply.  Here,

21   defendant pleaded guilty to, among other things, wire fraud,

22   in violation of 18 U.S.C. Section 1343.  Additionally, he

23   pleaded guilty to aggravated identity theft, in violation of

24   18 U.S.C. Section 1028A(a)(1).

25             To decide whether Section 2X1.1(b)(2) applies, I look

1    to the elements of wire fraud.  If this case were to go to

2    trial, the government would have to prove beyond a reasonable

3    doubt that Mr. Pitts participated in a scheme to obtain money

4    or property from the victim by fraudulent means.  In turn,

5    under the jury instructions that are applicable to a violation

6    of wire fraud, a scheme to defraud is a scheme that is

7    intended to deceive or cheat another and to obtain money or

8    property or cause the loss or potential loss of money or

9    property to another by means of materially false or fraudulent

10   pretenses, representations or promises.

11          Here, as Mr. Pitts admitted in his plea agreement, he

12   committed wire fraud when he submitted fraudulent information

13   to the Illinois Department of Employment Security, or IDES,

14   with the intent to fraudulently obtain and use unemployment

15   benefits in the name of the individuals that are identified in

16   the government's exhibit, Exhibit 1.  As the Seventh Circuit

17   noted in United States vs. Calvin, that's 191 Fed. Appx. 453,

18   2006, those actions are sufficient to establish a violation of

19   the wire fraud statute.

20          Similarly here, Mr. Pitts admitted to participating

21   in a scheme to defraud with the intent to defraud and used the

22   mail or wires in furtherance of that scheme.  That is enough

23   to complete the offense.  Therefore, the Court finds that the

24   three-level reduction under 2X1.1(b)(2) does not apply here.

25          Looking at the arguments that are made by Mr.

1   Giovannini in his submissions, those arguments go less towards

2   whether or not the defendant completed the acts necessary to

3   establish a violation of wire fraud, but they really go

4   towards whether the defendant should be held accountable for

5   the total amount of the intended loss that the government

6   claims.  And, so, I will go to that next.

7           But as far as Section 2X1.1(b)(2), I find that the

8   two-level reduction does not apply.

9           So, then let's turn to intended loss.  Intended loss

10  is defined as the pecuniary harm that the defendant purposely

11  sought to inflict.  That's Application Note 3.

12          So, here, the government argues that while Mr. Pitts

13  caused the actual loss of $788,951, the intended loss is

14  $5,808,096 because those are the maximum benefits that were

15  available to the individuals with respect to which Mr. Pitts

16  obtained information from the IDES as part of his fraudulent

17  scheme and with regard to whom Mr. Pitts actually submitted

18  claims.  Sometimes for the full amount of the amounts that

19  were available; other times for only part of the amounts that

20  were available for those particular individuals.

21          So, the question before the Court is whether Mr.

22  Pitts intended to maximize the benefits that were available to

23  each of the individuals when he obtained the debit cards from

24  IDES but was stopped when the accounts were frozen or whether

25  he simply stopped using them for some other reason.  The

1     government argues that Mr. Pitts had intended to maximize the

2     value of all of those debit cards because, number one, he knew

3     the amounts that were available based upon the correspondence

4     that IDES submitted or issued to -- in the individual's name

5     and, two, based upon 14 letters that the government obtained

6     from IDES with regard to some of those partially -- I'll call

7     them partially depleted accounts.

8            The government has attached to its supplemental brief

9     14 letters which the government refers to as "No Law" letters,

10    which basically informs the individual that for various

11    reasons, that the claims were not approved.

12           The question I had for the government as to those

13    submissions are two.  One is I understand that the government

14    selected 16 accounts and asked IDES for information as to

15    those accounts.  My questions are, how were those 16 accounts

16    selected, and why were there no similar letters for the two

17    accounts of the 16 for which the government didn't receive

18    such letters?

19           MR. KUTCHER:  My understanding, your Honor, is that

20    the accounts were selected by the agents to have a -- based on

21    the different types of accounts that were available.  Some

22    were not -- there was -- I believe no money was obtained based

23    on those accounts.  Some were partial money was obtained on

24    those accounts.  And the agents selected just a handful, a

25    sample of those accounts, and submitted those to IDES.

```
 1              THE COURT:  Do you know what parameters they used or
 2   why these accounts versus other accounts?
 3              MR. KUTCHER:  Can I take a minute?
 4              Thank you, your Honor.
 5        (Brief pause.)
 6              MR. KUTCHER:  Thank you, your Honor.
 7              So, the agents confirmed that essentially these were
 8   randomly selected.  They chose a selection that had, you know,
 9   from early in the scheme, from late in the scheme, some that
10   had money taken, some that didn't.  And they were just a
11   random selection.
12              And I should explain to the Court, right now IDES is
13   at over capacity in dealing with these things and that was
14   what I -- IDES had sent us, you know, I think maybe 15 or so.
15   And that's what they did.
16              With respect to the two, one of them was determined
17   to have been in a separate system because it involved, my
18   understanding is, a Chicago Public School employee and didn't
19   kind of follow the same system that -- where a letter like
20   this would be produced.  And the second one, the letter just
21   couldn't be found.  They just -- IDES just couldn't find any
22   letter one way or the other.
23              THE COURT:  Okay.
24              And, so, Mr. Giovannini, what is your response to
25   these letters or to what the government has presented?
```

1         MR. GIOVANNINI: Well, Judge, my understanding when

2  we were in court last time, your Honor was concerned with what

3  evidence the government was going to rely upon to show that

4  Mr. Pitts actually had submitted additional claims and was

5  turned down, or things of that nature. They have not done

6  that. They're just relying on the fact that he took some of

7  the money, so he must have been intending to take all of it.

8         They have no evidence at all that I've seen -- and

9  none has been presented to the Court -- that Mr. Pitts ever

10  tried to do anything else other than what he took out.

11  There's no -- as we tried to describe in our memorandum,

12  Judge, in order for him to get more money once he gets a debit

13  card, he has to submit another application. And that was not

14  done, for whatever reasons. The government wants you to

15  assume it was done because they stopped the accounts. I don't

16  think that's a fair assumption, Judge. Mr. Pitts, obviously,

17  as the Court has pointed out, was made aware, at least some of

18  these accounts, what the maximums were. There are very few of

19  the accounts on that government's extensive list that were

20  actually maxed out, very few, compared to the amount that were

21  -- just a little bit was taken out of.

22         So, I don't know that you can then project his intent

23  to take everything just from that without any proof that he,

24  in fact, tried to do that. If he had wanted to do that, he

25  would have done it. He would have made other -- he would have

1  filed additional claims.  But he didn't do that.  As far as we

2  know, he didn't do it.  I don't think it's fair to then try to

3  hold him accountable for all of the money that's involved

4  here.

5          MR. KUTCHER:  Your Honor, I just want to be clear on

6  terminology here.  With respect to this Government Exhibit

7  1 -- which was attached to the supplemental filing, as well --

8  the defendant made claims on all of them, whether or not he

9  actually used the debit card at the ATM.  That is reflected in

10 the two columns, the "Actual Loss" column.  So, if any money

11 was ever taken on one of those debit cards, that's reflected

12 in the actual loss.

13         And with respect to most of those, if nothing

14 happened -- for example, the defendant made a claim and IDES

15 realized immediately, before sending anything out, that this

16 was a fraudulent claim -- no loss is attributed to those cards

17 at all.  It's only when the claim is made, a card is sent,

18 some money is attempted to be taken out that any loss is

19 attributed here.

20         And it just -- with respect to the sample that we

21 chose, the fact that the overwhelming majority of them, 14 out

22 of 16 and the 16 -- the two doesn't mean that those were not

23 fraudulent, because we didn't have enough information.  But

24 the reason those were stopped were "No Law" claims is

25 indicative here not only of what happened, which is these

1   claims were generally stopped by some intervening act --

2   someone realized it, or some other intervening act -- but also

3   by common sense.  It doesn't make sense that the defendant

4   would make these claims, recertify these claims even after he

5   is -- so, recertify meaning they call in to report to IDES

6   that the person is not -- is no longer -- still not

7   employed -- take those steps and do that even after the

8   defendant is arrested in May of 2014.  He continued to do it

9   after that.

10          Then, in November of 2014, he's stopped by police,

11  found with these cards; continued to participate in the fraud

12  after that all the way up until December of 2015.  It just

13  defies common sense that the defendant's intent was to take a

14  few cards and only take some money out and not wanting --

15  didn't want to exhaust the cards that he had, the claims that

16  he made but for something stopping him.  That just -- as Judge

17  Lefkow, I believe, said in the Kennedy opinion, that just

18  doesn't make sense with this type of scheme.  That was the

19  whole point:  to get as much money as they possibly could.

20          THE COURT:  The thing about Stroger, right, and

21  Kennedy -- so, when I look at this chart, the questions I have

22  with regard to this issue deal with claims -- partially

23  depleted claims -- that are older, right?  Some that date back

24  to 2013, well before his arrest, right?  Or some in early 2014

25  and thereafter.

1        In Stroger, the defendant that was engaged in the

2    checking scheme was basically cashing checks until he was

3    apprehended and there was still a balance left, right?

4        In Kennedy, the defendant was basically -- there was

5    apparently proof in the record that the defendant went to one

6    state, kind of exhausted it, then went to another state, until

7    she was caught, until -- and then she exhausted it.  That's

8    what Judge Lefkow relies on.

9        Here, the letters from the 14 accounts are helpful,

10   but I don't know how representative -- there's nothing in the

11   record that tells me how representative they are of all of the

12   other counts, right?  Of the other partially deleted accounts.

13   And as you know, the government has the burden to prove the

14   loss amount.  And, so, without more evidence of, say, for

15   example -- because I don't even know among the 14 accounts,

16   for which the government submitted letters, which of those

17   were because it didn't really have any corresponding -- I

18   tried to look for names, but, of course, there are no names.

19   I tried to look for matching Social Security numbers; wasn't

20   able to find those, at least in my search.

21       And, so, the government would like me to extrapolate

22   and find that the defendant kind of used that approach -- in

23   other words, kind of used this exhaustion approach with regard

24   to all of the accounts -- but I'm just not sure that the

25   record -- there's enough in the record for me to make that

12

1   presumption.

2           MR. GIOVANNINI:  Judge, may I --

3           THE COURT:  Hold on for a second.  So, take for

4   example -- I don't even know how to go about referencing it.

5           MR. KUTCHER:  Use a last initial, first initial and

6   we can -- and then the last four digits of the Social.

7           THE COURT:  Okay.  Got it.

8           So, let's look at first initial C, last initial R.

9           MR. KUTCHER:  Then the last four digits of the

10  Social.

11          THE COURT:  1272.

12          So, a claim was submitted January 27th, 2017 -- I

13  mean 2013.

14          I'm looking at the exhibit Government 1 that was

15  provided at the last hearing, but let me see if I can find it

16  on --

17      (Brief pause.)

18          MR. KUTCHER:  We both have it.

19          THE COURT:  Okay.  Did you find it?

20          MR. KUTCHER:  Yes.

21          THE COURT:  So, what in the record -- what can I rely

22  on in the record to help me find that with regard to that

23  account Mr. Pitts stopped cashing anything out of that account

24  because of a "No Law" letter, as opposed to --

25          MR. KUTCHER:  Just --

1          THE COURT:  -- moving on with other cards or just,

2    you know, because of whatever other reasons he may have to not

3    use -- not to max out that card?

4          MR. KUTCHER:  You're correct, your Honor.  There is

5    no "No Law" letter that you can rely on there.  You're

6    correct, your Honor, there is no "No Law" letter that you

7    could rely on for that account.

8          Again, I think you can rely on the general nature of

9    the scheme and the 14 out of 16 letters that we did provide

10   as -- and extrapolate out from that, and just a general

11   understanding of human nature here and common sense that in

12   this case, for whatever reason, we have -- for example, based

13   on my understanding of the "No Law" letters, we haven't found

14   any example where there was not something intervening to stop

15   these claims.

16         So, why he stopped at 5,794 and didn't go all the way

17   to the 8,086, you're correct, there is nothing in the record

18   that tells you exactly why, other than the general nature of

19   the scheme and what we have with the other "No Law" letters.

20         THE COURT:  But you see why the date of that

21   transaction and other transactions are troubling.  Because, as

22   I said, it was much easier in Stroger where, you know, it was

23   very -- it was common sense that had the person not been

24   caught, he would have tried to deplete those accounts of any

25   funds because he kept doing it until a week before he was

1    apprehended.

2          Similarly, in Kennedy, you know, as I said, she went

3    from state to state, and there seems to be something in the

4    record for Judge Lefkow to rely upon that.

5          I understand the government's argument that I should

6    infer from the record that I have that with regard to all of

7    these transactions, number one, Mr. Pitts was stopped and,

8    number two, that that was the reason why he didn't deplete the

9    maximum value of the account.

10          And with regard to the -- and perhaps if there was

11   something in the record that would provide me with some

12   reasonable way of -- reasonable basis to extrapolate the 14

13   accounts that the government does provide to the other

14   accounts, that would give me some reasonable basis to find

15   that those 14 accounts were representative of the whole.  But

16   I just don't have that here.

17          So, that's what I've been struggling with when I look

18   at --

19          MR. GIOVANNINI:  Judge, may I point out two things,

20   Judge?

21          THE COURT:  -- what the government provided.

22          MR. GIOVANNINI:  Judge, may I point out two things?

23          THE COURT:  If you'd like.

24          MR. GIOVANNINI:  Well, very briefly, Judge, the

25   defendant was arrested in 2014, but it had nothing to do with

1    credit card theft.  He was arrested for possession of a stolen

2    car.  So, to say that he was arrested for this crime and

3    continued to do it is disingenuous, Judge.

4         The other thing you have to look at in the

5    government's charts are, look at all of the cases, all of the

6    people that he had information on that he didn't submit any

7    complaints -- any claims for.  I mean, obviously, if he was

8    that greedy, he would have started putting claims in for every

9    one of those accounts.  But he didn't.  It's a small

10   percentage that he did.

11        THE COURT:  All right.

12        So, a district court need only make a reasonable

13   estimate of a loss, not rendered with scientific precision.

14   That is true.  That's United States vs. Gordon, 495 F.3d 427

15   at 431, Seventh Circuit 2007.  That said, the government bears

16   the burden of proof on the loss amount.  United States vs.

17   Vivit, 214 F.3d 908 at 916, Seventh Circuit 2000.

18        As I said, the factual question before the Court is

19   whether the Court can find based upon the record here that

20   defendant intended to maximize the benefits that were

21   available to each of the individuals when he obtained the

22   debit cards but was stopped from doing so when the accounts

23   were frozen for some reason or, on the other hand, whether he

24   simply stopped using them for some other reason.

25        It's the government's burden to prove by a

1    preponderance of the evidence that the Court should side with

2    the former.  To do so, the government relies upon United

3    States vs. Stroger, as well as other cases that cite to it.

4    But as I said, what distinguishes Stroger from this case is

5    the timing.  In Stroger, the defendant was withdrawing money

6    based upon fraudulent checks up until the time that he was

7    apprehended.

8         But here, the government's exhibit indicates that for

9    many of the counts for which there was some money amount

10   remaining in the balance, the defendant submitted the last

11   claims in 2013 and 2014, well before the search that was

12   conducted by law enforcement officers in December of 2015.  To

13   address this issue, the government argues that the reasons

14   that defendant did not max out those accounts is because he

15   was caught or that the fraud was detected.  And in support,

16   the government submits 14, quote-unquote, "No Law" letters

17   from IDES that it obtained to prove this.

18        The government agrees that for those 14 accounts, the

19   government has met its burden to show that Mr. Pitts had

20   intended to max out the benefits on the cards but stopped

21   because his fraud was detected.  And that is what happened in

22   United States vs. Kennedy, where the defendant was maxing out

23   whatever benefits she could obtain in one state until she was

24   caught, when she would then move to another state.

25        But here, other than the 14 accounts for which the

1    government provides the letters, there is no evidence as to

2    why the defendant stopped withdrawing benefits from many of

3    these accounts.  And there's no basis in the record from which

4    the Court can reasonably extrapolate the 14 letters to all of

5    the other partially withdrawn accounts.  Therefore, based upon

6    this record, the Court finds the government has not satisfied

7    its burden to prove by a preponderance of the evidence that

8    the intended loss amount here is $5,808,096.  Accordingly, the

9    Court finds a total loss amount is $788,951 here.

10         With that, here is how I calculate the Total Offense

11   Level.  We start with a Base Level of 7 under Section

12   2B1.1(a)(1).  To that, we add 14 levels for the intended loss

13   between $550,000 and $1.5 million.  To that, I add two points

14   for the scheme involving ten or more victims under Section

15   2B1.1(b)(2)(A).  I add three levels for defendant being a

16   manager/supervisor under Section 3B1.1(b).  I subtract three

17   levels for acceptance of responsibility, and I get the Total

18   Offense Level of 23.

19         Is there any arguments or anything else that I have

20   missed so far?

21         MR. KUTCHER:  No, your Honor.

22         MR. GIOVANNINI:  No, I don't believe so, Judge.

23         THE COURT:  So, therefore, I find that Mr. Pitts'

24   Total Offense Level is 23, and his criminal history score is

25   4, resulting in a Criminal History Category of III.

1          Count 3 carries a maximum term of imprisonment of 20

2    years, a maximum term of supervised release of three years,

3    and a maximum fine of $250,000.

4          Count 11 carries a mandatory term of imprisonment of

5    two years, that must run consecutively.  In other words, in

6    addition to any other counts.  It also provides a term of

7    supervised release, that must also run concurrently to the

8    other counts, and a fine of $250,000.

9          Therefore -- let me just verify the supervised

10   release as to Count 11.

11       (Brief pause.)

12         THE COURT:  Mr. Kutcher, do you know if the term of

13   supervised release with regard to Count 11 has to be

14   consecutive or can it be concurrently?  I think it can run

15   concurrently, right?

16         MR. KUTCHER:  I believe the supervised release can

17   run concurrent.

18         THE COURT:  So, let me amend that.  With regard to

19   Count 11, with regard to supervised release, it provides a

20   term of supervised release of not more than one year and a

21   fine of $250,000.

22         The Guideline range, therefore, comes out to the

23   following:  In terms of term of imprisonment, 57 to 71 months

24   as to Count 1 and an additional 24 months under Count 11, a

25   supervised release of a period of two years as to Count 1 and

1    one year under Count 11, a fine of between $20,000 and

2    $250,000, and a special assessment of $100 for each count,

3    totalling $200.  And, of course, the Court is required to

4    impose restitution for the offense.

5              All right.  So, in addition to the advisory Guideline

6    range, I'm to consider the other factors set forth in 18

7    U.S.C. Section 3553(a) for sentencing.  I'm to consider the

8    nature and circumstances of the offense, as well as the

9    history and characteristics of the individual defendant.  I am

10   to consider the need for any sentence imposed to reflect

11   various factors, including the seriousness of the crime, the

12   need to promote respect for the law, to provide just

13   punishment for the crime; to afford adequate deterrence to

14   criminal conduct; to protect the public from any further

15   crimes of the defendant; and, provide the defendant with any

16   necessary educational or vocational training, medical care, or

17   other correctional treatment in the most effective manner.

18             I must also consider the kinds of sentences

19   available, as well as the advisory sentencing Guideline range

20   that we discussed.  I must also consider the need to avoid

21   unwarranted sentencing disparities and the need to provide

22   restitution to any victims of the offense.

23             So, Mr. Giovannini, I'll now give you an opportunity

24   to address the sentencing factors, as well as anything else

25   you believe is relevant to sentencing.

1          MR. GIOVANNINI:  Judge, I think a couple points I

2    would point out.  If you look at Mr. Pitts' background, aside

3    from one instance, his background is basically dealing with

4    traffic offenses.  He has no prior fraud convictions of any

5    kind.  Certainly no crimes of violence in his background.

6          There's no question he's going to be serving a

7    substantial penitentiary sentence, Judge.  And I know having

8    been representing him not only when this case started, but

9    also in state court before this indictment came down on

10   basically the same offenses, that he deeply regrets what he

11   did.  And for the last five or six years since this began, he

12   has led a law-abiding life.  He's tried to raise his daughter,

13   who was here in court today.  She relies upon him for not only

14   moral support and love, but also financial support, which

15   obviously he's not going to be able to give her if he's in the

16   penitentiary for that much longer a period of time.

17          And I'd also like to take the opportunity to say,

18   Judge, if your Honor recalls when this case started, Mr. Pitts

19   was placed on home confinement.  And that was for

20   approximately a year, give or take a couple days.  And during

21   that period of time, he had no violations to speak of.  He

22   asked to leave the jurisdiction one time, which your Honor, I

23   believe, gave him permission to do.  He's, I think, shown to

24   the Court that he can obviously obey the law and can obey the

25   Court's orders.  And for that reason, Judge, I think a

1   downward departure would be avail- -- should be available to

2   Mr. Pitts.

3            I think realistically that in light of the fact that

4   two years has to be served consecutive, which is mandatory,

5   that the 57 months on the first count, Judge, I think, would

6   be excessive under these circumstances, and I think it would

7   be unduly harsh on Mr. Pitts and his family.

8            THE COURT:  Thank you, sir.

9            Mr. Kutcher?

10           MR. KUTCHER:  Thank you, your Honor.

11           The government believes that a Guideline sentence is

12  sufficient and not more than necessary to satisfy the goals of

13  criminal sentencing here under the 3553(a) factors, and I'll

14  start with 3553(a)(1) and (a)(2)(A), the nature and

15  circumstances of the offense and the seriousness of the

16  offense.

17           This offense, this conduct was incredibly serious.

18  The defendant was involved in a scheme to defraud the people

19  of Illinois of unemployment benefits that were intended to

20  help people at their most vulnerable moments, when they are

21  out of work, often don't have enough money to support

22  themselves or their families.  The defendant took advantage of

23  this system as one part of the scheme.  He took advantage of

24  that system by filing all of these fraudulent claims.  He did

25  it knowingly.  He did it intentionally.

1          And to aggravate that side of things -- but he is

2     being sentenced for this under the aggravated identity theft,

3     he did it knowingly using stolen identities.  And he did that,

4     he used those stolen identities, not to file a couple of

5     these, not to do it once or twice, not to get a couple

6     thousand dollars here and there; he used hundreds of these

7     identities to file hundreds of these claims.

8          The scheme was complicated in the sense that the

9     defendant had to take each of these claims and log into a

10    computer, log into IDE -- to the IDES site, file the claim,

11    put the information into the computer.  That is, information

12    about someone else and someone else -- using someone else's

13    identity.  He had to make -- recertify those claims.  He had

14    to make sure the cards were going to an address where he

15    couldn't be detected.  He had to do all of this in a way where

16    he could mask what he was doing.

17         And he did it month after month after month after

18    month, over and over and over.  He did it -- as I said

19    earlier, after having been stopped by the police twice, he

20    continued to do it.  And he knew that he was under

21    investigation for identity theft or unemployment insurance

22    fraud because they took the cards from him when he was both

23    stopped in California and in Homewood, Illinois.  He had those

24    fraudulent cards on him.  They were taken.  He was talked to

25    about the investigation.  It couldn't have been clearer to him

1   that what he was under investigation for was identity theft

2   and stealing these funds because that's exactly what the law

3   enforcement agents talked to him about at that time.  So, he

4   knew that, and he continued to do it over and over and over.

5           The scope of the scheme also means that he had to

6   keep track of these claims that he made.  The agents found

7   evidence of that on the computer -- the multiple computers

8   that were found at the defendant's apartment; that he was

9   keeping track of all these claims; making sure that they could

10  recertify; tracking where the cards went.  He would change the

11  addresses to make sure that he could get the cards at the

12  appropriate place.

13          The defendant was a mastermind of this scheme, which

14  was complicated and took a lot of effort.  That's a lot of

15  work to do.  That's a lot of deliberation.  And the whole

16  point for him was to steal money so that he could support his

17  lavish lifestyle.  As the PSR sets forth, law enforcement

18  found a lot of lavish items when they arrested him.  Air

19  Jordan shoes, jewelry, things like that.  And that's why he

20  stole this money from IDES.

21          And the IDES letter that was submitted with the

22  government's memorandum makes clear that this is a serious --

23  incredibly serious offense.  IDES says:  Theft of unemployment

24  insurance benefits is not only a federal crime, it negatively

25  impacts hard-working taxpayers and business owners.  Currently

1    in Illinois we have one of the highest unemployment rates in

2    the nation.  Business taxes are at an all-time high, driving

3    business out of Illinois with the threat of more to come in

4    2021.  The number of fraudulent unemployment claims filed has

5    skyrocketed.  And illegally obtaining unemployment insurance

6    benefits puts a strain on the state's trust fund and puts

7    legitimate jobless claims at risk for non-payment.

8            That means that what the defendant did has serious

9    impacts on the state and on people who are applying for

10   unemployment insurance benefits.

11           But the defendant's conduct here not only had the

12   impact on the State of Illinois and the State of Illinois'

13   finances; it had a direct impact on Southwest

14   Gastroenterology, which was the medical services provider

15   that -- where the identities were stolen.  They provided a

16   victim impact letter talking about the impact on them, on

17   their doctors, but, more importantly, on the patients whose

18   identities were stolen and who the defendant -- the identities

19   who the defendant used to make these hundreds of claims.

20           Southwest Gastro in its victim letter said that

21   patients' personal data was stolen by the employee and these

22   patients entrusted Southwest Gastro with their personal data.

23   And rather than maintaining that trust, the employee stole

24   that information, provided it to the defendant who then used

25   it.

1      And the impact on the patients was significant.  One

2   patient had their entire retirement fund absconded.  Multiple

3   patients had their entire retirement funds depleted.  And the

4   impact on those patients, those Illinois residents, was

5   significant in the sense that to get that money back took a

6   lot of effort and years and years in some cases to make that

7   right.

8      Some of the victims also themselves wrote victim

9   impact statements, and the government provided those, as well,

10  as exhibits to our memorandum.  One of those victims stated

11  that this theft of that person's identity happened at the

12  worst time of the person's life.  It was after a divorce.

13  They were trying to get on with their life.  And as a result

14  of this, they tried to access their benefits and they

15  couldn't.  And as a result, they couldn't pay their bills and

16  they didn't have money for groceries, this victim says.  These

17  are real impacts on real people.

18     Another victim said that since their identity was

19  stolen by someone trying to collect unemployment insurance

20  benefits in their name, they have suffered fear.  They said

21  when they're buying gasoline or filing taxes, purchasing

22  groceries, they're afraid that their information is going to

23  continue to be compromised in the same way.  They're worried

24  that it's going to happen again and again and again.

25     And they had suffered by having difficulty buying a

1    house, buying a car, co-signing a loan as a result of this --

2    their identities being stolen and used in this way.  There are

3    other letters attached to the government's memorandum

4    detailing the impacts on real people.  Hard-working Illinois

5    citizens were impacted by this defendant's crime.

6           The seriousness of this offense cannot be

7    understated.  The amounts that -- the fact that defendant

8    caused an actual loss of over $700,000 is, frankly,

9    astounding, given the way he had to conduct this scheme, which

10   is getting thousands of dollars at a time.  To amount to that

11   much takes significant thought and deliberation, and it had

12   real impacts on real people.

13          With respect to the defendant himself and his

14   characteristics, it is true that he has limited criminal

15   history, and he certainly gets a benefit for that in the sense

16   of his criminal history score.  And the Court can take that

17   into consideration.

18          But the defendant's background is also devoid of

19   really undue hardship.  And it does beg the question for why

20   the defendant decided to get into this conduct and to

21   participate in it for so long, even after he was stopped by

22   law enforcement multiple times.  And the answer is for money.

23   He's a young man.  He clearly has the ability to work.  He

24   clearly has a knack for using the computer and filing claims

25   and doing those kind of things.  A lot of skills that could

1   be -- that could have been put to legitimate uses.  Instead,

2   he decided to just steal all of this money for his own

3   personal benefit and simply to live a lavish lifestyle.

4        There's also evidence that he did other types of

5   fraud that have not been charged, including using identities

6   for getting luxury vehicles.  It really -- the defendant's

7   background, his characteristics in some ways in that -- in

8   this instance are aggravating in the sense that he had a good

9   family, a good home, and yet he decided to go into this

10  fraudulent conduct for so long.

11       Now, I understand that defendant has raised his

12  daughter and that he will, of course, have to spend time away

13  from his daughter, but that isn't unique to this defendant.

14  People who commit crimes not only impact the victims of those

15  crimes; they impact their own families when they do this.  And

16  the collateral consequence that the defendant, sadly, won't be

17  able to spend time with his daughter is the result of his own

18  conduct, not the result of the sentence.

19       He did not think, for example, of all the families

20  that were impacted by his conduct or -- in the sense that the

21  victims themselves had families who were impacted.  And he

22  didn't think about all of the identities that were stolen and

23  that -- the impact that had on Southwest Gastro and the entire

24  patient population there.

25       So, while the fact that he has a daughter and he

1   cares about her, again, that collateral consequence is not, I

2   believe, mitigating here.

3       Now, no doubt the defendant did this to make money.

4   The motivation to make more money is a strong one.  And as a

5   result, it's important here that this sentence send a strong

6   message of deterrence for people like defendant who would

7   consider taking this route to try to make money rather than a

8   legitimate route.  And, so, from a deterrence standpoint, from

9   a general deterrence standpoint, the Guideline sentence is

10  appropriate here to send a right message that this Court will

11  not tolerate this kind of theft.  But it's also important for

12  this defendant, who was not deterred the multiple times he was

13  stopped and questioned and his apartments were searched with

14  respect to identity theft allegations.  That didn't stop him.

15  The multiple times that he was caught didn't stop him.  A

16  sentence here will be important to deter him going forward.

17      For all those reasons, we believe that a Guideline

18  sentence, in addition to -- consecutive to the two years the

19  defendant faces on the 1028A charge, is appropriate and is not

20  greater than necessary to satisfy the goals of criminal

21  sentencing.

22      THE COURT:  Thank you.

23      Mr. Giovannini, anything that you'd like to add?

24      MR. GIOVANNINI:  Judge, one thing I would just point

25  out, Judge.  Number one, he wasn't the person that initiated

1   stealing identities.  It was a young lady that worked at this

2   particular place who had sold it to other people other than

3   the defendant before he ever got involved.

4          And whatever the collateral consequences were, if it

5   were not directly related to unemployment benefits -- and I

6   don't know how many of these people actually would have

7   eventually filed for unemployment; maybe none of them; I don't

8   know; maybe ten of them -- you can't say that, okay, their

9   identities were stolen, somebody else used it to rob -- steal

10  a bank account.  You can't attribute that to Mr. Pitts.

11         Granted, what he did was serious.  There's no getting

12  around it.  It was serious and it was voluminous.  But, as

13  your Honor has noted last time we were here, it was very easy

14  for him to do it.  And, unfortunately, that's the case that he

15  found it so simple that it was hard not to do it.  And not

16  that that's an excuse, but I think, Judge, that all things

17  considered, he's shown that he has the ability to do the right

18  thing, to live a good life, to run a business.  He's run a

19  couple of businesses since he's been -- since this entire

20  thing ended.  He's intelligent.  And I think, Judge, that he

21  certainly has hopefully seen his last day in court as of

22  today.

23         THE COURT:  All right.  Thank you.

24         Mr. Giovannini, do you have any objections to the

25  conditions of supervised release that are recommended in the

1    Presentence Investigation Report?

2             MR. GIOVANNINI:  No, Judge, I do not.

3             THE COURT:  What about the government?

4             MR. KUTCHER:  No, your Honor.

5             THE COURT:  Mr. Giovannini, I will hear from Mr.

6    Pitts, but before we do, is there anyone else present who

7    wishes to be heard on his behalf today?

8             MR. GIOVANNINI:  No, Judge.

9             THE COURT:  Is there anyone that the government

10   wishes to present today live?

11            MR. KUTCHER:  No, your Honor.

12            THE COURT:  Mr. Pitts, if you would stand up, sir.

13            You have the right to make a statement today before I

14   determine your sentence.  You may waive that right after

15   speaking with your lawyer, but you have the right to make a

16   statement today.  Would you like to do so, sir?

17            THE DEFENDANT:  Yes.  Yes, I would, your Honor.

18            THE COURT:  Go ahead.

19            THE DEFENDANT:  Pull my mask down?

20            You know, I would first like to say, you know, I take

21   full responsibility for my actions.  You know, and even though

22   me and my counsel disagree with a lot of the details regarding

23   the offense, I want to make it clear I am, you know, aware

24   life is about choices.  And I don't blame anyone or any

25   circumstance for, you know, the choices that I did make.  You

1  know, they were in my past.  All I can say is I pray that the

2  Court, you know, kind of see I've turned my life around since

3  the incident.

4         And my main focus, you know, currently has just been

5  to, you know, be a great role model to my family and, of

6  course, my beautiful baby girl back there.  Outside of that I

7  just want to make it back to my family as soon as possible,

8  get this chapter behind me and move forward in a positive

9  direction.  I submit, you know, all of -- everything to the

10  Court and, you know, I leave it in you guys' hands.  That's

11  all.

12         THE COURT:  Thank you, sir.

13         We'll take a brief recess.  Thank you.

14     (Brief recess.)

15         THE COURT:  Mr. Giovannini, Mr. Pitts.

16         I've reviewed the Presentence Investigation Report,

17  the sentencing submissions by the parties, and I've considered

18  the arguments of counsel and the statements made by Mr. Pitts

19  today.  I will now state the sentence.

20         In arriving at the sentence, I considered a number of

21  factors.  For the record, I have considered the advisory

22  sentencing Guideline range.

23         With respect to the nature and circumstances of the

24  offense, starting from as early as December, 2013, Mr. Pitts

25  knew that Corey Logsdon was buying personal identification

1    information from Ashley Weathersby.  The personal

2    identification information was from patients that went to a

3    medical practice where Weathersby was employed.  Starting in

4    July 2014, Pitts started to give Weathersby cash and gifts to

5    get patients' PII, as well.  And around this time, Pitts

6    learned that co-defendant Angelo Steele was getting personal

7    identification information from Weathersby.

8            Pitts began using this information to fraudulently

9    apply for unemployment benefits with IDES, claiming that the

10   individual patients were out of work and otherwise qualified.

11   Pitts used addresses that did not belong to the patients from

12   co-defendants Korey Isbell, Kewan Watts and Yoshimi Henry, and

13   requested that IDES send the unemployment benefits ATM cards

14   to those addresses.  Pitts, along with the other defendants,

15   then obtained the ATM cards from those addresses and used them

16   to obtain cash for their own personal use.

17           Mr. Pitts admits that he used the personal

18   identification information of at least 171 patients of the

19   medical practice to file at least 645 fraudulent unemployment

20   applications with IDES.  He also admits that in total, he,

21   Logsdon and Steele used the information of at least 892

22   individuals without authorization and filed at least 892

23   fraudulent IDES applications.

24           Mr. Pitts participated in this scheme resulting in

25   losses of $788,951.  But it could certainly have been much

1  worse, given the extent of this fraudulent scheme.  This was

2  an extensive scheme that took place over many months and was

3  perpetrated by a number of individuals with whom Mr. Pitts

4  coordinated and some of whom Mr. Pitts directed.  The scheme

5  not only depleted money from a public fund that is intended to

6  help unfortunate individuals who are laid off or fired through

7  no fault of their own, but the use of the personal

8  identification information resulted in real harm to the

9  individual victims of the identity theft.  And Mr. Pitts

10 obviously cared little about the harmful impact his actions

11 would have on his victims.

12      What is more, even after he realized that he was

13 being investigated for identity theft by law enforcement, he

14 continued to engage in this fraud.  This is a very serious

15 crime and warrants a severe sentence.

16      Turning to Mr. Pitts' history and characteristics.

17 Other than the conviction for resisting law enforcement in

18 2013, Mr. Pitts does not have any other serious criminal

19 convictions, nor does he have a history of employing violence

20 or threats of violence.  I consider this to be a significant

21 mitigating factor.

22      On the other hand, the fact that Mr. Pitts began to

23 participate in the scheme while he was still on probation for

24 his 2013 conviction does raise a serious concern, and it does

25 demonstrate some risk of recidivism here.  That said, I

1    believe that the Criminal History Category of III does

2    overstate Mr. Pitts' criminal history somewhat.  He received

3    two points for committing the offense while he was on

4    probation, and the circumstances that led to that original

5    conviction are not clear from the record.

6         Furthermore, I observed that the four total criminal

7    history points puts him on the lower end of Category No. III.

8    Also, Mr. Pitts has been fully compliant with the conditions

9    of his pretrial release.  And, therefore, I consider these to

10   be mitigating factors for sentencing.

11        Turning to his personal background.  Mr. Pitts grew

12   up in a generally supportive family, although he did not have

13   the benefit of regular contact with his father after he was

14   ten years old.  Mr. Pitts enjoys a close relationship with his

15   mother and his siblings, and has a very close relationship

16   with his daughter that he continues to support, both

17   emotionally and financially.  This is very important and a

18   positive sign for rehabilitation.  I consider this to be a

19   significant mitigating factor, as well.

20        Mr. Giovannini asked me to also consider the fact

21   that Mr. Pitts has served the first year of pretrial release

22   on electronic monitoring, but I do not consider that to be

23   particularly mitigating.  However, I do recognize that Mr.

24   Pitts has not served a significant prison term in the past,

25   and I've considered this for sentencing.

1        Mr. Giovannini, are there any other mitigating

2  factors that I've not addressed today?

3        MR. GIOVANNINI:  No, Judge, I don't believe there

4  are.

5        THE COURT:  Mr. Pitts, you obviously are a very smart

6  and dedicated person.  You possess many traits and skills that

7  you can contribute to your family and to your community in a

8  positive way.  It is up to you, sir, to make sure that you're

9  doing that and that you're following the law.  Your family

10 counts on you.  Your daughter counts on you.  I hope that you

11 use these proceedings and your sentence as a wake-up call and

12 commit yourself to being a better member of society.

13       I can assure you, Mr. Pitts, that if you appear

14 before this Court or any other court for committing any

15 further crimes, your sentences will only become more and more

16 severe.

17       Turning first to supervised release -- well, before I

18 do that, I do want to recognize Mr. Pitts' family and

19 supporters who are here today.  They've been here at the other

20 hearings.  And their continued support of Mr. Pitts is

21 recognized by this Court.

22       Turning first to supervised release.  After

23 considering all the factors under 18 U.S.C. Section 3553(a), I

24 hereby impose a period of supervised release of two years as

25 to Count 1 and one year as to Count 11, to be served

1    concurrently.  I believe that this period of supervised

2    release is necessary to integrate Mr. Pitts back into society

3    once he is released from custody, and to provide the Probation

4    Department with a meaningful opportunity and the tools to

5    supervise Mr. Pitts in a meaningful manner.  The conditions of

6    supervised release that are recommended in the Presentence

7    Investigation Report are also imposed.

8            Mr. Giovannini, you have the right to have me read

9    each of the conditions in the record and to provide a more

10   detailed reasoning for each of the conditions, or you may

11   waive that right.

12           MR. GIOVANNINI:  Judge, we can waive that.  Mr. Pitts

13   and I have gone over those conditions, and he understands them

14   fully.

15           THE COURT:  All right.

16           Turning to the period of custody, defense counsel

17   requests a total term of imprisonment of 48 months; but, given

18   the extensive nature of the fraudulent scheme, the vast number

19   of victims whose personal identification information the

20   defendant and his actions compromised and his callous

21   disregard for the welfare of others, I do not believe that a

22   term of 48 months is sufficient to satisfy the purposes of 18

23   U.S.C. Section 3553(a).  However, based upon the significant

24   mitigating factors I've discussed, I also believe that a

25   Guideline sentence that is on the high end of the Guideline

1    range would be greater than what is necessary.

2          Therefore, after giving this much thought, balancing

3    the aggravating factors, which here is the extensive nature of

4    the fraudulent scheme and the harm that Mr. Pitts caused to

5    the vast number of people whose lives he impacted, weighing

6    that against, on the other hand, Mr. Pitts' lack of a criminal

7    history, his lack of violence and his family support, I hereby

8    impose upon Mr. Pitts a total term of imprisonment of 81

9    months.  57 months as to Count 1 -- that is the lowest end of

10   the Guideline range -- and 24 months as to Count 11, which by

11   statute has to run consecutively.

12         I find that a term of 81 months necessary, given the

13   extensive nature of the offense, to provide just punishment

14   for the crime and to deter Mr. Pitts, as well as others, from

15   committing similar crimes.

16         For the record, I would note that even if I had

17   agreed with the government as to the intended loss, I would

18   have still sentenced Mr. Pitts to 81 months of incarceration,

19   given the significant mitigating factors that I have

20   discussed.  Anything more, I believe, would be too severe.

21         Restitution is ordered in the amount of $788,951.

22   Furthermore, given the amount of restitution and Mr. Pitts'

23   financial condition, I am waiving the fine.  And a special

24   assessment of $200 is imposed by the Court.

25         The Court finds the sentence as I stated is

38

1  sufficient, but not greater than necessary, to satisfy the

2  purposes of 18 U.S.C. Section 3553(a).

3          Mr. Giovannini, do you have any legal objection to

4  the sentence I've proposed other than what you've already

5  argued or request any further elaboration of my reasons?

6          MR. GIOVANNINI:  No, Judge.

7          THE COURT:  What about the government?

8          MR. KUTCHER:  No, your Honor.

9          THE COURT:  The sentence and judgment will be entered

10  accordingly.

11          Mr. Pitts, you have the right to appeal the validity

12  of your plea and the sentence that's imposed.  Any appeal must

13  be filed within 14 calendar days of the entry.  If you cannot

14  afford to appeal, you have the right to apply for leave to

15  appeal in forma pauperis and the Clerk of the Court will

16  prepare and file a notice of appeal upon your request.

17          What about surrender dates?  Do you have a request as

18  to surrender dates?

19          MR. GIOVANNINI:  Judge, we were going to request

20  approximately a three-month date.  And the reason for that is

21  Mr. Pitts does have some business affairs he has to clear up,

22  which may take him a little while to do.  If the Court would

23  indulge us in that, we would appreciate it.

24          THE COURT:  Mr. Kutcher?

25          MR. KUTCHER:  We have no objection to that, your

```
 1    Honor.

 2              THE COURT:  All right.

 3              I will order that Mr. Pitts surrender himself to the

 4    appropriate designated facility on July 30th, by 2:00 p.m.

 5              Mr. Pitts, I want to remind you that until that time,

 6    the conditions of your release are still in effect and you

 7    must still comply with them.

 8              Do you understand that, sir?

 9              THE DEFENDANT:  Yes.

10              THE COURT:  Do you have a recommendation as to

11    location?

12              MR. GIOVANNINI:  No, Judge.

13              THE COURT:  Anything else I can address for the

14    government?

15              MR. KUTCHER:  No, your Honor, not from the

16    government.

17              THE COURT:  Would you like me to recommend, Mr.

18    Giovannini, that Mr. Pitts be assigned to an appropriate

19    facility as close to the Chicago area as possible?

20              MR. GIOVANNINI:  Well, actually --

21         (Defendant confers with his attorney off the record.)

22              MR. GIOVANNINI:  His daughter is actually residing in

23    Georgia with her mother.  If we can get somewhere closer to

24    there, that would be, I think, preferable.

25              THE COURT:  Atlanta?
```

```
 1              (Defendant confers with his attorney off the record.)

 2              MR. GIOVANNINI:  Apparently, they're going to be

 3     relocating also, Judge.  So, it's difficult to tell where

 4     they're going to be.  They may be back here, they may not be.

 5              THE COURT:  Okay.

 6              Do you know when that decision will be made?

 7              THE DEFENDANT:  Next couple weeks.

 8              MR. GIOVANNINI:  Probably in the next few weeks

 9     they'll know where they're going to be moving to, Judge.

10              THE DEFENDANT:  Given this situation, I'll be able

11     to get a definite -- given this situation, I'll be able to get

12     a definite -- a way quicker definite answer what's going on,

13     you know.

14              THE COURT:  So, Mr. Kutcher, how can I make that

15     recommendation?  Because I would like to do it.

16              MR. KUTCHER:  Assuming -- if it's only a few weeks,

17     if you were to hold off on entering the J&C and maybe

18     Mr. Giovannini can contact your deputy, provide the location,

19     and then enter the J&C at that time.

20              THE COURT:  That's fine.

21              Mr. Pitts, if you can let your attorney know within

22     the next couple of weeks, then he can let Ms. Acevedo know by

23     e-mail, cc'ing Mr. Kutcher, and I'd be happy to make that

24     recommendation.

25              MR. GIOVANNINI:  That would be fine, Judge.  Thank
```

1    you.

2              THE COURT:  So, until then, I will not enter the J&C.

3              MR. GIOVANNINI:  Thank you, Judge.

4              MR. KUTCHER:  Your Honor, to ensure that this gets

5    done soon, maybe we could have just a status on the calendar,

6    and if Mr. Giovannini can provide the Court with the

7    information before that, we can adjourn the status.  But just

8    to keep something in place.

9              THE COURT:  That's fine.  That makes sense.

10             Let's set this for status on May 14th in the morning.

11             I'll pick a time.

12             9:30.

13             MR. GIOVANNINI:  Judge, if I can get that information

14   to the Court ahead of time, will that --

15             THE COURT:  I'll strike that.

16             MR. GIOVANNINI:  Okay.  Fair enough, Judge.  Thank

17   you very much, your Honor.

18             THE COURT:  Thank you.

19             MR. KUTCHER:  Thank you, your Honor.

20                         *     *     *     *     *

21

22   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

23

24
     /s/ Joseph Rickhoff                    January 20, 2023
25   Official Court Reporter